IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOE A. WILLIAMSON, | ) | CASE NO. 8:05CV195 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER of the SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial of Plaintiff Joe A. Williamson's

disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C.

§§ 401 *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the

Act, 42 U.S.C. §§ 1381 *et seq.*  The Court has carefully considered the record and the

parties' briefs.

## PROCEDURAL BACKGROUND

The Plaintiff, Joe A. Williamson, filed his initial applications for Disability and SSI

benefits on February 24, 1997, alleging inability to work since December 12, 1996.  (Tr. 91-

93, 308-10).  Those applications were denied on April 9, 1997, and Williamson did not

pursue further review.  (Tr. 21, 41, 45-48, 311-14).  Williamson's current applications were

filed on April 4, 2000.  (Tr. 21, 94-96).  The claims were denied initially.  (Tr. 42, 49-53,

315-18, 323).  Williamson's appeal proceeded directly from the initial denial to the

administrative law judge.[1]  (Filing No. 15 at 4 n.2; Filing No. 20 at 2).  An administrative

---

[1]Williamson was living in Michigan at the time, and Michigan is one of several states
participating in a test of modifications to the disability determination procedures.  20 C.F.R.
§§ 404.906, 404.966, 416.1406, 416.1466.  Williamson now lives in Omaha, Nebraska.
(Filing No. 1 ¶ I).

hearing was held before Administrative Law Judge William E. Decker ("ALJ") on February 21, 2002, in Kalamazoo, Michigan. (Tr. 21, 324-52). On April 25, 2002, the ALJ issued a decision finding that Williamson was not "disabled" within the meaning of the Act and therefore not eligible for either disability or SSI benefits. (Tr. 21-31). On March 16, 2005, the Appeals Council of the Social Security Administration denied Williamson's request for review. (Tr. 7-9). Williamson now seeks judicial review of the ALJ's determination as the final decision of the Defendant, Jo Anne B. Barnhart, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1).

Williamson claims that the ALJ's decision was incorrect because: 1) the ALJ committed "reversible error in failing the affirmative duty required by [Social Security Ruling ("SSR") 00-4p] to ask about any possible conflict between the Vocational Expert evidence and information provided in the Dictionary of Occupational Titles ("DOT");" 2) the testimony of the Vocational Expert was insufficient for the ALJ to meet the burden of proof at Step 5 of the sequential evaluation; and 3) the ALJ committed reversible error in failing to find Williamson's testimony credible. (Filing No. 15 ("Williamson Brief") at 5).

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Williamson is currently forty-nine years old. (Tr. 328). He has a high school education and three years of college education. (Tr. 22). Williamson's past work experience includes employment as a polisher, material handler, processing technician, and truck loader. (Tr. 22, 343-344). He alleges he became disabled due to a neck

disorder.  Specifically, he alleges disability due to cervical corpectomy, anterior cervical discectomy, and fusion.[2]  (Tr. 109).

### Williamson's Testimony

Williamson last worked on December 12, 1996.  (Tr. 330).  He incurred a neck injury and received a settlement of $39,502.00 in a workers' compensation case in May 1998. (*Id.*). He had neck fusion surgery on December 19, 1996, which gave him some relief from his pain, but he still claims he experiences constant neck pain.  (Tr. 332-33).  He alleges he cannot turn his head or look up or down.  (Tr. 333).  He claims he experiences numbness and weakness in his hands.  (*Id.*).  He claims his doctor restricted him from bending, turning, lifting over five pounds, sitting for long periods of time, standing for long periods of time, and turning his head back and sideways.  (Tr. 334).  He also experiences weakness in his grip and claims he could not hold a job that required repetitive or forceful grasping or gripping.  (Tr. 335).  Williamson is able to button and zip clothing, although it is difficult and time-consuming.  (*Id.*).  He can groom himself and take showers if he has help coming out of the shower.  (Tr. 335-36).  He does not do much walking or running because he experiences numbness in his toes, but he can walk at a slow pace.  (Tr. 336, 340). He alleges he can only sit or stand for approximately four to five minutes.  (Tr. 340).

Williamson takes or has taken the following medications: Vicoprofin, Celebrex, Vicodin, and Viagra.  (Tr. 337).  He has been diagnosed with depression, but he is not receiving any treatment or medication for the condition.  (Tr. 338, 340).  He has trouble

---

[2]"Cervical corpectomy," "anterior cervical discectomy," and "fusion" refer to surgical procedures.

concentrating.  (Tr. 339).  He alleges he experiences difficulty sleeping due to pain in his

neck and hip, because a graft was taken from his hip for his neck surgery.  (Tr. 338).

Williamson is divorced and has a stepson.  (Tr. 329).  He lives with his sister, who

helps care for him.  (Tr. 342).  He does little housework, but he occasionally takes the trash

out or warms food in the microwave.  (*Id.*).  He attends his nephew's athletic events.  (*Id.*).

He no longer dances or plays basketball or football.  (Tr. 343).  He is able to drive once or

twice a week; however, he experiences weakness and numbness in his hands.  (*Id.*).  His

main daily activity is watching television.  (*Id.*).

### *Vocational Expert's Testimony*

Testimony was also heard from a vocational expert ("VE"), Michael Simons, under

contract with the Social Security Administration ("SSA"). (Tr. 331-32, 349-52).  The VE

testified that, assuming Williamson's testimony was true concerning the pain in his neck;

weakness and numbness in his hands and toes; limitations in turning his head sideways,

up and down; limitations in the use of his upper extremities for gripping; limitations in

walking, sitting, standing, and lifting, and reaching overhead; difficulty focusing; and need

to recline for five hours during the day, Williamson could not perform his former work or

any other jobs on a full-time basis.  (Tr. 349).  The VE stated that the main factor in his

inability to work would be his alleged need to lie down five hours during the work day.  (*Id.*).

Assuming Williamson could lift up to twenty pounds; could be on his feet six hours

out of eight; would not be required to climb; and could occasionally grasp and frequently

use fine manipulation, then he could perform unskilled clerk positions.  (Tr. 350).  The VE

testified there were 50,000 such positions in Michigan (Tr. 350, 352).  The VE testified

there were 20,000 security guard positions, 4,000 base packaging positions, 12,000 inspector positions, and 5,000 machine tender positions.  (Tr. 350).

Assuming in addition to the above limitations, Williamson's neck limitations and need to avoid repetitive rotation or prolonged flexion and extension, the VE testified there would be 10,000 clerk positions, 10,000 security positions; however, the industrial jobs would be eliminated.  (Tr. 350-51).  Assuming these same neck limitations and assuming Williamson had to avoid bending at the waist; could only lift five pounds; and could not sit or stand for a prolonged time, the VE testified that there would be jobs at the sedentary level available, including: looking at television security monitors.  (Tr. 351). The VE testified there would be about 1,500 such positions, and there would be approximately 10,000 sedentary sit/stand unskilled clerk positions.  (*Id.*).   The VE further testified that if Williamson needed to recline more than the scheduled breaks, those jobs may be unavailable.  (*Id.*).

### *Documentary Evidence Before the ALJ*

In addition to oral testimony, the ALJ considered medical evidence.  In 1996, Jonathan W. Hopkins, M.D., diagnosed Williamson with a large disc herniation with cord compression in the cervical spine that produced pain, numbness, and weakness.  (Tr. 292-295).   In December 1996, Williamson underwent surgery performed by Jeffrey A. Kornblum, M.D., for an anterior fusion at C4-6.  (Tr. 225-242).  X-rays in January 1997 revealed excellent alignment at the cervical fusion site, and examination showed remarkable improvement in Williamson's neurological symptoms.  (Tr. 287, 300).  On follow-up in February and May 1997, with Dr. Hopkins, Williamson exhibited continued improvement in strength, grasp, and gait, with reported residual pain across the back of his

neck, weakness in his hands, and numbness in his thigh. (Tr. 285). Dr. Hopkins noted that although Williamson's grasp was reduced, he was "locking his fingers more than just squeezing." (*Id.*). Repeated testing showed somewhat variable strength in the hands. (Tr. *Id.*).

In November 1997, Dr. Hopkins noted that Williamson continued to complain primarily of numbness in his right leg. (Tr. 284). On examination he had pretty good finger abduction with a strong grasp on the left and was weaker on the right. (*Id.*). An MRI showed that the cord was no longer compressed and there was no misalignment. (*Id.*). Dr. Hopkins recommended a somatosensory evoked potential evaluation ("SSEP") to test for loss of proprioception.[3] (*Id.*).

On follow-up April 17, 1998, Williamson complained of episodic difficulties with his hands, noting that on some occasions he could curl five pounds, while on others he could not hold a bottle of pop. ( Tr. 281). An examination revealed a good range of motion of the neck, considering his fusion. He had variable strength with good finger abduction. (*Id.*). Dr. Hopkins noted that Williamson's SSEP was normal, and that he may have been experiencing residuals from his fixed cord injury. (Tr. 281-282).

On June 29, 1999, Williamson reported that he was stable and his numbness had not worsened. (Tr. 278). Dr. Hopkins noted that Williamson's strength seemed normal with a persistent faint trace of weakness in grasp and fine motor function. (*Id.*). He opined

---

[3]Proprioception is "[a] sense or perception, usually at a subconscious level, of the movements and position of the body and especially its limbs, independent of vision. . . ." *Stedman's Medical Dictionary* 1458-59 (27th ed. 2000).

that Williamson may not be able to do light factory work due to his lack of grasp and certainly should not do heavy factory work because of his neck.  (*Id.*).

On June 9, 2000, Williamson underwent a consultative physical examination by Anjanette M. Stoltz, M.D.  (Tr. 252-54).  Dr. Stoltz noted that Williamson continued to complain of pain down his arms and had a diminished range of motion in his neck.  (Tr. 254).  He was able to do fine motor movements and orthopedic maneuvers with only mild difficulty.  (*Id.*).  He had a normal gait without the use of an assistive device.  (*Id.*).  He did have decreased grip bilaterally with seventy percent grip remaining.  (*Id.*).  He could pick up a coin, fasten a button, and open a door bilaterally without difficulty.  (Tr. 253).  X-rays of the left knee and right ankle were essentially normal.  (Tr. 255).

Robert L. Griffith, Psy.D., performed a consultative psychological examination on June 24, 2000.  (Tr. 256).  Williamson reported that he had weakness in his hands, had had surgery on his back, and that his pain was an eight on a 1-10 scale.  (*Id.*).  He indicated he was depressed, including feelings of fatigue, inability to concentrate, irritability, feelings of worthlessness, and suicidal ideations without any intent.  (*Id.*).  Dr. Griffith diagnosed Williamson with a depressive disorder, not otherwise specified.  (Tr. 258).  Dr. Griffith recommended counseling.   (*Id.*).

On follow-up with Dr. Hopkins on September 29, 2000, Williamson reported that his complaints were essentially the same, with episodes of numbness and burning in his hands that came and went, and seemed to be worse if he used his hands a lot.  (Tr. 277).  An examination showed Williamson to be in no great distress.  (*Id.*).  Dr. Hopkins noted that Williamson did have loss of range of motion of the neck in all directions, but that it was not

a severe loss. (*Id.*). He had a slightly weak grasp, which was worse on the right. (*Id.*).

Dr. Hopkins noted that he and Williamson discussed jobs that Williamson could perform.

(*Id.*). Dr. Hopkins opined that Williamson could work in reception or as a guide where he

did not have to use his hands. (*Id.*).

On November 15, 2001, Williamson was seen at the emergency room after slipping

on cooking oil. (Tr. 304). An x-ray of the cervical spine showed his healed fusion, with no

acute injury. (Tr. 302). On follow-up November 21, 2001, Williamson reported numbness

and tingling in his right hand with neck pain that was worsening to John R. Hunt, D.O.

(Tr. 304). Dr. Hunt diagnosed post-traumatic cervical myofascial pain. (Tr. *Id.*).

Williamson was prescribed Vicodin. (*Id.*).

On January 23, 2002, Williamson reported to Dr. Hunt that he had recently been

very busy taking care of his terminally ill sister and her family in the Midwest. (Tr. 303).

He reported consistent numbness in his hands and arms, with occasional numbness and

tingling into his legs. (*Id.*). He reported that he periodically took Vicodin for pain. (*Id.*). Dr.

Hunt advised Williamson on stretching, ice or heat, massage, and activity level, and asked

Williamson to return if his symptoms increased. (*Id.*).

On February 21, 2002, Dr. Hunt opined that Williamson should not lift over 15

pounds, could not do overhead work, and should limit twisting, bending, and positional

changes of the neck. (Tr. 307).

## THE ALJ'S DECISION

The ALJ found Williamson was not "disabled" within the meaning of the Social

Security Act. (Tr. 22). The ALJ framed the issue as: 1) whether Williamson was entitled

to disability and SSI benefits under the Act; and 2) whether Williamson was "disabled." (Tr. 21-22).

The ALJ noted that Williamson had previously applied for disability on February 24, 1997, and this application was denied on April 9, 1997. (Tr. 21). Because no appeal of that denial was taken and because the ALJ found there was no good cause to reopen Williamson's prior application, the ALJ determined the time period from December 12, 1996, to April 9, 1997, was foreclosed from relitigation by the doctrine of administrative finality. (*Id.*). Therefore, the only issue before the ALJ was whether Williamson was disabled at any time from April 10, 1997, through the date of the ALJ's decision. ( *Id.*).

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920 (2005)[4] to determine whether Williamson was disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to . . . his ability to perform past relevant work or other work that exists in the regional and national economies. This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 22).

Following this analysis, the ALJ found that Williamson was not disabled. (Tr. 22). Specifically, at step one, the ALJ found that Williamson has not performed any substantial gainful work activity since December 12, 1996. (Tr. 22, 23, 30). At step two, the ALJ found Williamson's degenerative disc disease of the cervical spine, status-post surgical fusion was considered severe within the meaning of the Act's regulations. (Tr. 23, 30). At step three, the ALJ found Williamson's medically determinable impairment did not meet or

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, further references will only be to § 404.1520.

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4., known as the "listings." (*Id.*). At step four, the ALJ determined Williamson is unable to perform his past relevant work. (Tr. 28, 30).

Finally, at step five, the ALJ found Williamson has the residual functional capacity ("RFC") to perform a significant range of light work, including work as a clerk or a security guard. (Tr. 29, 30). The ALJ further found these jobs were available in significant numbers in the national economy. (*Id.*). In so deciding, the ALJ weighed Williamson's testimony, finding his allegations regarding his limitations were not totally credible. (Tr. 27, 30). The ALJ also carefully considered the medical records submitted by treating physicians Dr. Hopkins and Dr. Hunt, and the opinions of consultative physicians Dr. Hampstead and Dr. Weintraub. (Tr. 24-28). The ALJ found Williamson was not disabled, was not entitled to a period of disability or the payment of disability insurance benefits, and was not eligible for payment of supplemental security. (Tr. 30-31).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo. Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Eichelberger v. Barnhart,* 390 F.3d 584, 589 (8th Cir. 2004). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270

F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).

## DISCUSSION

### *"Disability" Defined*

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### *Sequential Evaluation*

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment

meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* § 416.920 (a)(4)(I)-(v). If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is made. *Id.*

In this case, the ALJ completed the five step process, concluding: 1) Williamson has not performed any substantial gainful work activity since December 12, 1996; 2) Williamson's degenerative disc disease of the cervical spine, status-post surgical fusion was considered severe within the meaning of the Act's regulations; 3) Williamson's medically determinable impairment did not meet or medically equal one of the "listings;" 4) Williamson is unable to perform his past relevant work; and 5) Williamson has the RFC to perform a significant range of light work, including work as a clerk or security guard. (Tr. 30).

## *Questions Posed to Vocational Expert*

Williamson claims that the ALJ committed reversible error regarding his questioning of the VE. (Filing No. 15 at 5-8). Williamson claims the ALJ failed to: 1) question the VE about any potential conflict between the VE's testimony and information in the DOT as required by Social Security Ruling 00-4p;[5] 2) pose a proper hypothetical question that

---

[5]SSR 00-4p states in pertinent part:

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

included all of Williamson's limitations; and 3) make a good record of the VE testimony when certain responses on the transcript were identified as "inaudible." (*Id.*).

With regard to Williamson's first argument, both parties agree that although the ALJ stated in his decision that the VE testified that his testimony was consistent with the DOT, no such testimony occurred and the ALJ failed to inquire about any potential conflicts. (Tr. 324-52; Filing No. 15 at 6; Filing No. 20 at 16). SSR 00-4p sets forth an affirmative responsibility on the part of the ALJ to inquire about potential conflicts between the DOT and the VE's testimony. While the Court recognizes the ALJ erred in not inquiring into potential conflicts and in incorrectly stating that such an inquiry was made, the Court finds this was not a reversible error because Williamson failed to demonstrate that there was a conflict between the VE's testimony and the DOT. *See Jones v. Barnhart*, 364 F.3d 501, 506 n.6 (3d Cir. 2004) (stating mere failure to inquire about possible inconsistencies between the DOT and VE testimony did not mandate reversal when that failure was harmless error). The ALJ has a duty to resolve conflicts between the VE's testimony and the DOT when such a conflict exists, but in the absence of a conflict, such an inquiry would not have changed the ALJ's ultimate decision that Williamson is not disabled.

Williamson next argues that the ALJ failed to include limitations set forth by Williamson's treating physician, Dr. Hunt, and presented to the ALJ following the hearing. (Tr. 307; Filing No. 15 at 7-8; Filing No. 20 at 14). A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ

---

If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

as true, and if the questions likewise exclude impairments that the ALJ has reasonably

discredited. *Pearsall v. Massanari,* 274 F.3d 1211, 1212 (8th Cir. 2001).

Examining the hypothetical posed to the VE in this case, the question properly

included the impairments that the ALJ found to be substantially supported by the record

as a whole. Dr. Hunt listed the following permanent restrictions for Williamson: 1) no lifting

over fifteen pounds; 2) no over-head work; and 3) limited twisting, bending, and position

changes of neck. (Tr. 307). The ALJ did not have an opportunity to specifically present

Dr. Hunt's restrictions to the VE because he did not have this information at the time of the

hearing. (*Id.*). However, at the hearing, Williamson testified to the limitations Dr. Hunt

verbally expressed to Williamson. (Tr. 334). Additionally, the final hypothetical the ALJ

posed to the VE included the following limitations: no bending or turning of the whole upper

body and neck, no bending at the waist, no lifting over five pounds, and no prolonged

sitting and standing. (Tr. 351). The VE testified that given these limitations, there would

be approximately 1,500 security monitoring positions and 10,000 sedentary sit/stand

unskilled clerk positions available to Williamson. (*Id.*). The Court finds that based on the

hypothetical the ALJ posed to the VE and the ultimate findings of the ALJ, the ALJ

contemplated the specific limitations set forth by Dr. Hunt. The Court finds the ALJ's

decision that Williamson could perform work that exists in the national economy based on

Williamson's RFC is supported by substantial evidence in the record as a whole.

Williamson's third argument is that the ALJ failed to make a "good record" of the

VE's testimony because "[f]or reasons unknown, certain responses in the transcript of the

testimony are identified as 'inaudible.'" (Filing No. 15 at 8). This argument is without merit.

Williamson cites two instances in the hearing testimony where the VE's responses were

inaudible.  A review of the transcript of the hearing testimony demonstrates that the first inaudible response related to discussion of Williamson's past work, which occurred more than fifteen years ago.  (Tr. 331-32).  This past work is not considered relevant because it was outside the fifteen-year time period considered for past relevant work.  *See* 20 C.F.R. § 404.1560(b)(1) (stating "[p]ast relevant work is work that [the claimant has] done within the past  15  years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it.").  The second inaudible response related to the VE's discussion of whether Williamson could perform any work if he truly needed to lie down for five hours a day.  (Tr. 349).  The ALJ specifically found that Williamson's claim that he needed to spend a total of five hours lying down each day was "not substantiated by the medical evidence nor by [Williamson's] own description of his energy level, activities, and lifestyle."  (Tr. 27).  Therefore, the fact that there are two inaudible responses in the transcript of the hearing testimony is irrelevant to the ALJ's ultimate decision that Williamson is not disabled.

### *Credibility of Williamson's Testimony*

Williamson argues that the ALJ did not properly assess his credibility.  (Filing No. 15 at 8-12).  The ALJ found that Williamson's testimony regarding his limitations was not totally credible.  (Tr. 27, 30).  The credibility of Williamson's testimony in its entirety is crucial because, in determining the fourth and fifth factors relating to a claimant's residual functional capacity to perform past relevant work and a range of work activities in spite of his impairments, the ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain complaints.  The underlying issue is the severity of the pain.  *Black v. Apfel,*

143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue was whether the record as a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication; and
> 5. functional restrictions.

16

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework

for determining the credibility of subjective complaints, e.g., pain.

An ALJ is required to make an "express credibility determination" when discrediting

a social security claimant's subjective complaints.  *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th

Cir. 2000).  This duty is fulfilled when an ALJ acknowledges the *Polaski* factors,[6] and the

ALJ has clearly examined the factors before discounting the claimant's testimony.  An ALJ

is "not required to discuss methodically each *Polaski* consideration."  *Id.* at 972.

The federal regulations provide that the ALJ must consider all symptoms, "including

pain, and the extent to which symptoms can reasonably be accepted as consistent with the

objective medical evidence," defined as "medical signs and laboratory findings."  20 C.F.R.

§ 416.929.  Medical "signs" are defined as:

anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

"Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically

___

[6]The ALJ's failure to cite *Polaski* is excusable under the circumstances of this case; *Polaski* is an Eighth Circuit decision, and the hearing before the ALJ took place in Kalamazoo, Michigan, which is in the Sixth Circuit. The Court nevertheless finds the ALJ properly considered the factors contemplated by *Polaski.*

17

acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 416.928(c).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).[7]

---

[7]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Williamson's case, the record illustrates that the ALJ performed a thorough analysis in determining the credibility of Williamson's subjective pain complaints. The ALJ summarized in detail Williamson's complaints, including his neck pain, and numbness and weakness in his extremities. (Tr. 25). The ALJ considered Williamson's daily activities, which include: cleaning, doing yard work and repairs, shopping, limited cooking, limited driving, engaging in social activities, playing board games, watching movies, and attending sporting events. (Tr. 27). The ALJ also noted that Williamson is able to groom and bathe himself. (*Id.*). The ALJ considered the fact that Williamson has not alleged side effects due to medication and there have been no frequent changes in his types or dosage of medication. (*Id.*).

The ALJ stated that Williamson has a tendency to exaggerate his symptoms. (Tr. 27). The ALJ noted that Williamson testified that he was paralyzed prior to having surgery; however, his medical records did not support this claim. (*Id.*). Williamson further testified that he is unable to turn his head or look up or down. The ALJ stated that the medical evidence indicated that Williamson's cervical range was limited, but it was still functional. (*Id.*). The ALJ further noted that Williamson's claim that he had to lie down five hours a day was not substantiated by the medical evidence or Williamson's own description of his

19

lifestyle and activities. (*Id.*). Finally, the ALJ opined that although Williamson testified that his doctor had restricted him from lifting over five pounds and from prolonged sitting or standing, the ALJ found no such restrictions in the medical evidence. (*Id.*).

In summary, the ALJ thoroughly considered Williamson's subjective pain complaints, the reports of his physicians, and Williamson's own statements.  The ALJ correctly engaged in an analysis that contemplated the factors set forth in *Polaski* and SSR 96-7p. The ALJ's conclusion that Williamson has the RFC to engage in a significant range of light work is substantially supported by the record as a whole.

Therefore, the ALJ appropriately determined that Williamson's testimony regarding his limitations was not totally credible.  The Court finds the ALJ's express credibility determination is substantially supported by the record as a whole.

## CONCLUSION

For the reasons stated in this memorandum, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 20th day of July, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge